**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ARLENE M. BRODBECK,**

                                                    **Plaintiff,**

        **v.**                                                          **5:05-CV-0257**
                                                                        **(NAM/GHL)**

**MICHAEL J. ASTRUE**,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                                    **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

Olinsky & Shurtliff, LLP                       Jaya A. Shurtliff, Esq.
300 S. State Street, 5th Floor
Syracuse, New York 13202
Attorney for Plaintiff

Glenn T. Suddaby                               William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                      Barbara L. Spivak, Esq.
Social Security Administration                 Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278                       Jennifer S. Rosa, Esq.
Attorney for Defendant                         Assistance Regional Counsel


** On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social Security
Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is automatically
substituted for former Commissioner Joanne B. Barnhart as the defendant in this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Arlene M. Brodbeck brings the above-captioned action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of the Social Security Act, seeking a review of the Commissioner of Social Security's decision to deny her application for disability benefits and supplemental security income benefits.   This matter was referred to Magistrate Judge George H. Lowe for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).  Magistrate Judge Lowe recommended that this Court reverse the Commissioner's decision to deny benefits and remand this matter.  Presently before the Court are the Commissioner's objections to two aspects of Magistrate Judge Lowe's Report and Recommendation.

## II.     PROCEDURAL HISTORY

The Court adopts the Procedural History as set forth by Magistrate Judge Lowe in the Report and Recommendation in its entirety:

> Plaintiff filed an application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on August 12, 2003.  (Administrative Transcript ("T") at 48-50, Dkt. No. 6.) The application was denied initially. (T. at 32-37.)  Plaintiff requested a hearing before an Administrative Law Judge ( "ALJ") which was held on May 20, 2004. (T. at 39-41, 179-204.) On June 25, 2004, the ALJ issued a decision finding that Plaintiff was not disabled. (T. at 25-31.)

> Plaintiff appealed to the Appeals Council, and the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on January 18, 2004.[1] (T. at 4-6.)  Plaintiff commenced this action on February 28, 2005. (Dkt. No. 1.)

(Report and Recommendation, Dkt. No. 14, pp. 1-2.)

---

[1] Although the date stamp for the request for review by the Appeals Council states January 18, 2004, as the ALJ's decision was not rendered until June 2004, the Court assumes that the Appeal Counsel's [sic] denial of the request for review did not occur until January 2005.

### III.    FACTUAL BACKGROUND

Plaintiff was born on May 18, 1959 and was 45 years old at the time of the administrative hearing on May 20, 2004. (T. 25, 26, 48)[2].  Plaintiff is single, lives alone and has 4 grown children. (T. 99, 190).  Plaintiff has a 10th grade education and although she studied for her GED, she has not taken the test. (T. 184).  From March 1984 until February 2002, plaintiff was an "independent" cab driver.  (T. 61).  From February 2002 until November 2002, plaintiff was employed as a cashier/attendant at a fuel station. (T. 61).  Plaintiff was last employed from September 2002 until May 2003 by Dunkin' Donuts as a cashier/baker.  (T. 61).

In February 2004, plaintiff completed a vocational evaluation at VESID to assist with employment planning. (T. 91-93).  Upon completion of her evaluation, the counselor suggested that plaintiff delay further planning as she may need further surgery. (T. 95).  Plaintiff's last day of work was May 5, 2003.[3]  (T. 61).  Plaintiff alleges she is disabled due to cubital tunnel syndrome. [4]  (T. 26).

### A.    Plaintiff's Medical Treatment

Dr. Michael Nancollas first treated plaintiff for her alleged disabling condition on July 11, 2001.[5]  (T. 119).  She complained of right hand pain and numbness for the last 2 years.  (T. 119). Dr. Nancollas diagnosed plaintiff with right cubital tunnel syndrome and prescribed a splint to wear.

---

[2] Portions of the administrative transcript, Dkt. No. 6, filed by the Commissioner, will be cited herein as "(T.__)."

[3] Plaintiff claims that "her boss released her due to pain". (T. 61).  However, the VESID records indicate that she was let go due to "absenteeism". (T. 93).

[4] Cubital tunnel syndrome is a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand. *Dorland's Illustrated Medical Dictionary* 1852 (31st ed. 2007).

[5] The record indicates that plaintiff was seen at University Hospital Emergency Room on July 5, 2001, however the record does not contain any reports from the hospital.

(T. 119).  Dr. Nancollas advised plaintiff that she could return to work the next day  without restriction. (T. 119).  On August 15, 2001, Dr. Nancollas examined plaintiff and noted that her complaints and condition were unchanged.  (T. 118).  Dr. Nancollas diagnosed plaintiff with bilateral cubital tunnel syndrome (right greater than left).  (T. 118).  Dr. Nancollas prescribed a course of physical therapy and again advised plaintiff that she could return to work without restrictions. (T. 118).  Dr. Nancollas also referred plaintiff to Dr. Cari Allen Jones for electric diagnostic studies to rule out any ulnar or medial nerve compressions. (T. 118).

Dr. Cari Allen Jones examined plaintiff once on August 31, 2001.  Dr. Jones performed nerve conduction studies which were abnormal. (T. 100).  Dr. Jones diagnosed plaintiff with bilateral moderate cubital tunnel syndrome (more affected on right than left).  (T. 100).  However, Dr. Jones noted that this was "without evidence of axonal involvement". (T. 100).  Dr. Jones found no evidence of carpal tunnel syndrome, neuropathy or radiculopathy. (T. 100).

On September 17, 2001, plaintiff returned to Dr. Nancollas to discuss the results of Dr. Jones' testing. (T. 117).  Physical therapy had not resolved plaintiff's complaints, therefore, Dr. Nancollas recommended surgery with post-op therapy.  (T.117).  Dr. Nancollas noted that plaintiff would be fully disabled beginning on November 1, 2001 however, she could return to work after surgery with limitations on gripping and lifting. (T. 116-117).

Plaintiff underwent a right cubital tunnel release on November 1, 2001.  (T. 105).  She had one post-operative visit with Dr. Nancollas and then did not treat with Dr. Nancollas again until a year and a half later. (T. 113-114).  On April 11, 2003, plaintiff complained of pain in her left elbow. (T. 113).  Dr. Nancollas gave her a night splint and pain medication. (T. 113).  Plaintiff was advised that she could return to work with the following restrictions: no more than 40 hours per week; no

lifting over 10 pounds; no repetitive motion; and limited pushing and pulling. (T. 113).

On May 13, 2003, plaintiff advised Dr. Nancollas that she was terminated from work as her employer could not accommodate her restrictions. (T. 111).   Dr. Nancollas noted that although plaintiff was unemployed, she could work.  (T. 111). Dr. Nancollas prescribed a course of physical therapy and pain medications.  (T. 111).  On May 15, 2003, plaintiff began physical therapy at Physical Therapy Plus. (T. 145).  Plaintiff received therapy for her right shoulder and elbows from May 2003 until August 2003. (T. 139-145).

Plaintiff returned for three additional examinations with Dr. Nancollas in June, August and September 2003.  In September, Dr. Nancollas concluded that additional surgery for her left cubital tunnel syndrome was necessary. (T. 109-111, 168).  During those visits, Dr. Nancollas continually noted that plaintiff could work. (T. 109-111, 168). On October 31, 2003, plaintiff underwent surgery for a left cubital tunnel release. (T. 166).  At that time, Dr. Nancollas noted she was disabled. (T. 166).  Plaintiff returned for physical therapy on November 17, 2003. (T. 137).  She received therapy 3 times a week until December 30, 2003. (T. 133).  Plaintiff returned once more to therapy in February 2004 and treated 3 times a week until her last noted visit on March 22, 2004. (T. 129).

Plaintiff continued to treat with Dr. Nancollas after her surgery and had 5 subsequent visits with the last examination on March 25, 2004. (T. 160-165).  At the March 2004 visit, Dr. Nancollas noted that plaintiff was moderately partially disabled. (T. 160).

During the time that plaintiff treated with Dr. Nancollas, she also received treatment from Marsha Snyder, M.D. for complaints of pain in her lower back.  (T. 152, 154-155).  On December 30, 2003, plaintiff complained of lower back pain beginning after she was "playfully pushed off the

bed" by her boyfriend a number of years ago. (T. 154).  Upon examination, Dr. Snyder noted that plaintiff was in no acute distress. (T. 154).  Plaintiff's walk test was symmetrical and pain free.  (T. 154).  Plaintiff exhibited some pain upon flexion at 80 degrees but extension and lateral bending were full. (T. 154).  Straight leg raising was negative, sensation in lower extremities was intact and toe/heel standing was normal. (T. 154).  Dr. Snyder diagnosed plaintiff with chronic back pain and recommended shoe inserts and prescribed Trillsate [sic], Humbid [sic] and Zyban.[6]  (T. 155).

Plaintiff had one subsequent examination with Dr. Snyder on February 23, 2004. (T. 152). At that time, plaintiff continued to complain of lower back pain that was only minimally improved with physical therapy.[7] (T. 152).  Dr. Snyder diagnosed plaintiff with spinal stenosis, requested an MRI of her lumbar spine, and prescribed Ultram and Remeron.[8] (T. 152).

On March 3, 2004, plaintiff underwent an MRI of her lumbar spine.  (T. 149).  The examination revealed lumbar spondylosis without stenosis and a small disk protrusion.[9] (T. 150).

On May 5, 2004, Dr. Nancollas completed a Physical Medical Source Statement. (T. 174-178).  Dr. Nancollas noted that plaintiff's impairments never interfere with her attention or concentration. (T. 175).  Dr. Nancollas offered no opinion on plaintiff's ability to sit, stand or walk explaining that her injury is related to her upper extremities. (T. 175).  Dr. Nancollas opined that

---

[6] Trilisate is an anti-inflammatory. *Dorland's Illustrated Medical Dictionary* 1994 (31st ed. 2007). Humbid is a cough expectorant. *Id.* at 886.  Zyban is an antidepressant used as an aid in smoking cessation.  *Id.* at 2124.

[7] The record does not contain any evidence that plaintiff received physical therapy for her lower back condition.

[8] Ultram is used for the treatment of moderate to moderately severe pain following surgical procedures. *Dorlands's Illustrated Medical Dictionary* 2027 (31st ed. 2007).  Remeron is an antidepressant. *Id.* at 1646.

[9] Lumbar Spondylosis is degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes. *Dorlands's Illustrated Medical Dictionary* 1780 (31st ed. 2007).

plaintiff could occasionally lift and carry 10 pounds or less, but could rarely lift and carry 20 pounds; could occasionally reach repetitively; and could grasp with both arms. (T. 176-177). Dr. Nancollas noted that plaintiff could frequently twist, stoop, crouch and climb stairs. (T. 177). Dr. Nancollas concluded that plaintiff had no other limitations that would affect her ability to work at a regular job on a sustained basis. (T. 177).

On May 6, 2004, plaintiff had one visit with Edgar Stanley, M.D. (T. 146). Dr. Stanley noted that plaintiff was in no acute distress but had some tenderness in her back. (T. 146). Plaintiff's neurological examination was "pretty much unremarkable" and her "remainders were negative". (T. 146). Dr. Stanley prescribed Naprosyn and aqua therapy.[10]

On the same day, Dr. Stanley completed a Physical Medical Source Statement. (T. 169-173). Dr. Stanley stated that emotional factors contribute to plaintiff's limitations. (T. 170). Dr. Stanley opined that plaintiff is only capable of low stress jobs as she cannot stand up for long periods or walk long distances. (T. 170). According to Dr. Stanley, plaintiff could walk half of a city block without resting; could sit for more than 2 hours; and stand for 30 minutes at one time. (T. 170-171). Dr. Stanley opined that plaintiff could stand/walk less than 2 hours and sit for 4 hours in an 8 hour workday. (T. 171).

**B.      Consultative Examinations**

Plaintiff underwent an Independent Medical Examination by Dr. Robert Cady, an orthopedic surgeon, at the request of Zurich Insurance Company, on July 2, 2003.[11] (T. 107). Dr. Cady noted that plaintiff had full range of motion in both forearms, a decreased grip in her left hand and a loss

---

[10] The record does not contain any evidence that plaintiff had aqua therapy.

[11] This examination was conducted in relation to plaintiff's Workers' Compensation case.

of flexion and extension in her left elbow. (T. 107).   Dr. Cady diagnosed plaintiff with bilateral cubital tunnel syndrome, with the right improved following surgery. (T. 107).  Dr. Cady opined that plaintiff was capable of non-repetitive work without lifting over 10 pounds. (T. 107).

The record also contains a Physical Residual Functional Capacity ("RFC") Assessment form dated September 15, 2003 completed at the request of the agency.[12] (T. 120).  The analyst found that plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for 6 hours in an 8 hour workday; sit for 6 hours in an 8 hour workday. (T. 121).  The analyst also concluded that "claimant's allegations of pain and limitation are attributable to a medically determinable impairment and are credible". (T. 123).

On March 16, 2004, plaintiff was evaluated by Donald Cally, M.D. an orthopedic surgeon who conducted another Independent Medical Examination in relation to plaintiff's Workers' Compensation claim. (T. 157-159).  During the examination, Dr. Cally noted a positive Tinel's sign in both of her wrists and a normal strength and sensory examination in her right elbow.[13] (T. 158).  With respect to her left elbow, plaintiff had some tenderness but demonstrated a full range of motion after the doctor removed her splint.  (T. 158).  Dr. Cally opined that plaintiff could work a job that does not require her to do any repetitive heavy activities with her left upper extremity.  (T. 158).  Dr. Cally noted no restriction with regard to her right elbow. (T. 158).

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

To be eligible for Social Security disability benefits, a claimant must establish  "inability

---

[12] The name of the analyst is not legible on the report and it is unclear whether the assessment was based upon an examination or record review.  (T. 120).

[13] Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve.  *Dorland's Illustrated Medical Dictionary* 1741(31st ed. 2007).

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in gainful activity since the filing date of her application. (T. 26).  At step two, the ALJ determined that plaintiff's degenerative disc disease of the lumbar spine and cubital tunnel syndrome were severe.  (T. 27). At step three, the ALJ concluded that plaintiff's impairments neither met nor equaled any impairment listed in Appendix 1 of the Regulations. (T. 27).  The ALJ next found that plaintiff retained the residual functional capacity to perform sedentary work. (T. 29).  The ALJ found that plaintiff never repetitively uses her upper extremities or performs frequent fine manipulation with her hands.  (T. 29).  The ALJ also found that plaintiff must be able to sit after standing every half hour but that her ability to sit is not limited.  (T. 29).  Therefore, at step four, the ALJ concluded that plaintiff was unable to perform any of her past relevant work. (T.29).  Since plaintiff claims that she suffers from exertional and non-exertional limitations, the ALJ obtained the testimony of

a vocational expert to determine whether there were jobs plaintiff could perform.  Based upon the vocational expert's testimony, the ALJ concluded at step five, that plaintiff is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (T. 30).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 17).   The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  This action followed.

## V.     REPORT AND RECOMMENDATION

In the Report and Recommendation, the Magistrate Judge found that: (1) the ALJ did not err in assigning little weight to the medical source statement of Dr. Stanley; (2) the ALJ failed to properly evaluate plaintiff's RFC; (3) the hypothetical provided to the vocational expert was in error; (4) the ALJ erred in failing to clarify whether a conflict existed between the personal experiences of the vocational expert and the *Dictionary of Occupational Titles*  ("*DOT*") listings; and (5) the ALJ properly assessed plaintiff's credibility.  (Dkt. No. 14).

The Commissioner filed two objections to the Report and Recommendation.  First, the Commissioner objects to the Magistrate Judge's finding that the ALJ failed to properly evaluate plaintiff's RFC.  Second, the Commissioner objects to the conclusion by the Magistrate Judge that the ALJ failed to clarify whether a conflict existed between the testimony of the vocational expert and the *DOT* listings. (Dkt. No. 15).   The Commissioner did not specifically object to any other portion of the Report and Recommendation, including the portions regarding the weight given to treating sources and plaintiff's credibility.  Accordingly, the Court accepts these portions of the Report and Recommendation in their entirety.  Plaintiff responded to the Commissioner's objections, but filed no objections to the Report and Recommendation.  (Dkt. No. 16).

**VI.     DISCUSSION**

**A.     Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled.  Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and citation omitted).  An ALJ is obligated to develop the record regardless of whether claimant is represented by counsel.  *See Shaw*, 221 F.3d at 131 (citations omitted).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court engages in a *de novo* review of any part of a Magistrate's Report and Recommendation to which a party specifically objects.  Failure to object timely to any portion of a Magistrate's Report and Recommendation operates as a waiver of further judicial review of those matters.  *See Roland v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).  The Court will address defendant's objections accordingly.

**B.     Residual Functional Capacity**

Residual functional capacity is:

"what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and

continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

In this case, the ALJ determined that plaintiff has the residual functional capacity ("RFC") to perform a significant range of sedentary work.[14]  (T. 31).   Specifically, the ALJ concluded:

> The claimant is able to perform sedentary work.  She never repetitively uses the upper extremities or performs frequent fine manipulation with her hands.  She must be able to sit after standing every half hour. Her ability to sit is not limited.  (T. 31).

The Magistrate Judge found that the ALJ failed to properly evaluate plaintiff's RFC as he failed to specify the amount of pounds plaintiff could lift and/or carry as well as the amount of time she could walk and stand. (Dkt. No. 14, p. 14).  Defendant argues that the ALJ's analysis included the ability to sit, stand, move her arms and manipulate her hands.  Therefore, defendant asserts that the ALJ included the "function by function" analysis required by the Regulations. (Dkt. No. 15, p. 3).  Defendant concedes that the analysis does not explicitly state that the RFC is applied to an 8

---

[14] Sedentary work is defined as:

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if  walking and standing are required occasionally and other sedentary criteria are  met.

20 C.F.R. § 404.1567(a).

hour workday, however, defendant argues that it is "implied" in the determination.  (Dkt. No. 15, p. 3).

### 1.        Function by Function Analysis

The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.  Social Security Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity.  20 C.F.R. § 404.1513(c)(1).  Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.  *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007).

Conclusory statements regarding plaintiff's capacities are not sufficient.  *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *Sullivan v. Secretary of HHS*, 666 F.Supp. 456, 460 (W.D.N.Y. 1987) (holding that in assessing RFC, the Secretary must make findings specifying what functions plaintiff is capable of performing, not simply making conclusory statements regarding plaintiff's capacities).   To determine whether a claimant can do a certain category of work, the ALJ must assess plaintiff's strength limitations, or exertional capacity, including the ability to sit, stand, walk, lift, carry, push and pull. §§ 404.1569a(a), 416.969a(a); *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations.  *LaPorta v. Bowen*, 737 F.Supp. 180, 183 (N.D.N.Y. 1990).

In this case, the Court finds that the record lacks substantial evidence to support the RFC determination.  The ALJ concluded plaintiff could perform sedentary work, but failed to specifically outline plaintiff's limitations.  (T. 29).  The ALJ stated that plaintiff "must be able to sit after standing every half hour" and "her ability to sit is not limited".  (T. 29).  However, nowhere in the decision did the ALJ make any determination or analysis of plaintiff's ability to walk, lift, carry, push or pull.  (T. 29).  Although the ability to do sedentary work necessarily implies what plaintiff can do despite her limitations, such does not absolve the ALJ from his duty to outline, function-by-function, plaintiff's restrictions in his ability to do work-related activities and whether or not he has the capacity to work on a regular and continuing basis.  As the ALJ failed to make the required function-by-function analysis of plaintiff's capabilities pursuant to the Regulations, the Court has no basis upon which to determine whether the ALJ's finding that plaintiff had the RFC for sedentary work is supported by substantial evidence.  *See Ferraris*, 728 F.2d at 587 ("On the basis of the ALJ's insufficient findings here, we cannot determine whether his conclusory statement that plaintiff could carry out sedentary work is supported by substantial evidence."); *see also Matejka v. Barnhart*, 386 F.Supp.2d 198, 208 (W.D.N.Y. 2005) (concluding that the ALJ's determination that plaintiff had the RFC for sedentary work was not supported by substantial evidence because the ALJ failed to conduct a function analysis of plaintiff's RFC).

Accordingly, the Court remands this matter to the Commissioner for further proceedings.


**2.       Regular and Continuing Basis**

Defendant argues that although the ALJ did not explicitly state that the RFC applied to an 8 hour workday, it was implicit that the ALJ based plaintiff's abilities on a "regular and

continuing basis". (Dkt. No. 15, p. 3). In support of this argument, defendant points out that the ALJ gave weight to Dr. Nancollas' opinions which were in the context of an 8 hour workday. *Id*.

RFC is an assessment of an individual's ability to sustain work-related physical and mental activities in a work setting on a regular and continuing bases. Social Security Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). A 'regular and continuing basis' means eight hours a day , for five days a week, or an equivalent work schedule. *Id*. Courts have reversed decisions of the Commissioner for not evaluating an RFC on this basis. *Brown v. Barnhart*, 2002 WL 603044, at *7 (E.D.N.Y. 2002) (citations omitted); *Mardukhayev v. Comm'r of Social Security*, 2002 WL 603041, at *6 (E.D.N.Y. 2002); *Murray v. Apfel*, 1998 WL 412639, at *8 (E.D.N.Y. 1998).

In the assessment, the ALJ gave "greater weight" to the treating physician opinions and specifically relied upon the Physical Medical Source Statement completed by Dr. Nancollas. (T. 143-178). Although defendant is correct that Dr. Nancollas rendered his opinions in accordance with an 8 hour workday, those opinions were given only as to plaintiff's ability to lift and carry.[15] (T. 176). Dr. Nancollas offered no opinion with respect to plaintiff's ability to perform any other exertional activities in an 8 hour workday. Therefore, upon remand, in addition to performing the appropriate function by function analysis of all of plaintiff's strength limitations, the ALJ must also discuss plaintiff's ability to perform work activities on a "regular and continuing basis". Accordingly, the Court agrees with the Magistrate Judge and remands this matter for an analysis of plaintiff's RFC in accordance with the Regulations.

**D.     Vocational Expert**

---

[15] The pre-printed form did not directly address or seek information from Dr. Nancollas regarding plaintiff's ability to push or pull.

The Magistrate Judge found that the ALJ failed to develop the record with respect to the vocational testimony.  First, the Magistrate Judge concluded that the record is unclear as to whether the vocational expert consulted the *Dictionary of Occupational Titles* ("*DOT*") in describing the exertional and skill levels of jobs. (Dkt. No. 14, p. 16).  Second, the Magistrate Judge concluded that the record is unclear as to whether the vocational expert's opinions that were based on his experiences conflicted with the *DOT*.  *Id*.  The Commissioner argues that the record clearly shows that the vocational expert's testimony was based on the *DOT* and supplemented by his own job analyses.  (Dkt. No. 15, p. 5).  Further, defendant asserts the vocational expert did note when his opinion was different from that of the *DOT*".[16] (Dkt. No. 15, p. 6).

Social Security Ruling 00-4p provides:

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and [i]f the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

---

[16] In the Report and Recommendation, the Magistrate Judge discussed the testimony of the vocational expert and concluded that the hypothetical presented by the ALJ failed to adequately present all of plaintiff's functional limitations. The Magistrate determined that this was in error and recommended remand "to determine the availability of jobs in the national and regional economy based on revised RFC limitations".  (Dkt. No. 14, p. 16). Defendant does not object to this portion of the Report and Recommendation.

SSR 00-4p, 2000 WL 1898704, at *3-4 (S.S.A. Dec. 4, 2000).  The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  If a conflict exists between the evidence provided by the expert and the *DOT*, the ALJ must determine whether the expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the *DOT*.  *Massachi*, 486 F.3d at 1153.

In this case, the vocational expert identified two possible jobs: surveillance system monitor and security guard. (T. 199-200).  The job of surveillance system monitor is defined as sedentary work.[17]  *Dictionary of Occupational Titles*, 379.367-010, 1991 WL 673244 (G.P.O.). The job of security guard is defined as light work.[18]  *Dictionary of Occupational Titles*, 372.167-010, 1991 WL 673083 (G.P.O.).

The vocational expert testified that the job of surveillance system monitor was sedentary. (T. 199).  He further testified that based upon his "on site job analysis of this position on several occasions, I don't find it to be typically involving frequent use of hands . . ." (T. 199).   The ALJ conducted no inquiry as to whether this portion of the testimony was consistent or in conflict with the *DOT* definition of the job.

---

[17] See n. 13, *supra.*

[18] Light work is defined as:

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

With respect to the second job, the vocational expert clearly identified a conflict between his personal analysis and the *DOT* classification regarding the job of security guard.  (T. 200). The expert stated:

> "Exactly [sic] security guard per se is light in terms of physical demand per the *DOT*.  But my experience as a vocational counselor, I've done many job analyses of this position . . . , I would say 40 percent of those positions are sedentary." (T. 200).

Based upon the vocational expert's testimony, the ALJ concluded that "the claimant has the residual functional capacity to perform a significant range of sedentary work". (T. 31).   The ALJ noted in the decision that:

> "The vocational expert testified the that . . . [plaintiff] is capable of making a vocational adjustment to other sedentary work.  Specific examples nationally/regionally (Syracuse) include work as a surveillance system monitor, 166,000/400, and security guard 400,000/800. The vocational expert further testified these jobs are consistent with those listed in the Dictionary of Occupational Titles, personal job analyses, and prevailing job studies (SSR 00-4p)." (T. 30).

With respect to the work as a surveillance monitor, the ALJ failed to inquire about a possible conflict between the information in the *DOT* and the expert's testimony.  *Ormberg v. Astrue*, 2007 WL 3390921, at *2 (9th Cir. 2007) (quoting *Massachi,* 486 F.3d at 1153 (holding that the ALJ must first determine whether a conflict exists [and][i]f it does, the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the *Dictionary of Occupational Titles*).

The ALJ's analysis with respect to the definition and description of work of a security guard is equally flawed.  Defendant concedes that a conflict exists but asserts that the expert gave a reasonable explanation for the difference.  (Dkt. No. 15, p. 5).  The *DOT* defines the work of a security guard as "light work" and the ALJ classifies it as "sedentary work".  Although the

18

vocational expert admitted that he defined the job differently during the hearing, the ALJ did not address the conflict in the decision and should have made an inquiry to determine if the vocational expert's conclusions were reliable.  *Peralta v. Barnhart*, 2005 WL 1527669, at *12 (E.D.N.Y. 2005).  The ALJ cannot accept the expert's classification of the work as "sedentary" when the *DOT* provides a different classification.  *See Smith v. Barnhart*, 172 Fed.Appx. 795, 799 (10th Cir. 2006) (holding that where the *DOT* clearly classifies the kitchen helper and janitor/cleaner jobs as medium, not light, work and the VE does not supply any reason for classifying the exertional demands of these occupations differently than the *DOT*, the ALJ may not rely on the VE's indication that these jobs are light work).

Accordingly, the Court agrees with the Magistrate Judge and on remand, if a vocational expert testifies, the ALJ is directed to inquire about any possible conflict between the testimony and the *DOT*.

**VI.    CONCLUSION**

Based upon the foregoing, and the reasons stated in the Report and Recommendation, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge George H. Lowe is **ADOPTED** in its entirety; and it is further

**ORDERED** that the decision of the Commissioner be **REVERSED**, and this case be **REMANDED** pursuant to 42 U.S.C. § 405(g) for a proper determination of plaintiff's residual functional capacity and for further clarification and application of SSR 00-4p with a reasonable explanation regarding conflicts between the vocational expert testimony and the *Dictionary of Occupational Titles*.

**IT IS SO ORDERED.**

Dated: March 7, 2008
          Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge